THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY HAMILTON *et al.*, Defendants-Appellants.

First District (1st Division)    Nos. 79-2281, 79-2282 cons.

Opinion filed October 5, 1981.

James J. Doherty, Public Defender, of Chicago, and Larry Hamilton, *pro se* (James H. Reddy, Assistant Public Defender, of counsel), for appellant Larry Hamilton.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago, and Theodore A. Gottfried, of State Appellate Defender's Office, of Springfield, for appellant Willie Robinson.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Noble Nacev, and Mark A. Graf, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

In a jury trial, defendants Larry Hamilton and Willie Robinson were found guilty of murder, attempt murder and attempt aggravated kidnapping. Hamilton was sentenced to terms of 1250 to 2500 years for the murder conviction, 75 to 150 years for attempt murder and 5 to 15 years for the attempt aggravated kidnapping. Robinson was sentenced to terms of 500 to 1000 years, 150 to 300 years and 6 2/3 to 20 years respectively for the crimes. The sentences were ordered to run concurrently.

Both defendants appeal. Hamilton contends (1) the jury was improperly selected in that it was a conviction-prone *Witherspoon* jury; (2) his convictions for attempt murder and attempt aggravated kidnapping should be reversed because he was not proved accountable beyond a reasonable doubt for Robinson's actions; and (3) the sentence of 1250 to 2500 years for murder is excessive. Robinson contends (1) he was not proved guilty of murder beyond a reasonable doubt; (2) certain cross-examination and closing arguments by the prosecution were prejudicial; (3) the use of a prior drug conviction for impeachment purposes was improperly allowed by the trial court; (4) the trial court improperly refused to give instructions to the jury on voluntary manslaughter; and (5) the sentences of 500 to 1000 years for murder and 150 to 300 years for attempt murder are excessive and ignore the potential for rehabilitation.

The following testimony was adduced at trial:

On January 19, 1978, at approximately 2:30 a.m., Mark Furman and his wife, Claudia, were driving home on the Calumet Expressway near 146th Street. An accident occurred in which a car driven by Larry Hamilton struck the Furman car from behind. Both cars pulled off to the side of the road. The drivers of both cars got out and inspected the damage to their respective cars.

Hamilton and Furman had a conversation at the rear of the Furman car. Defendant Robinson testified that this conversation was with loud words and hand gesturing, but he did not know what they were saying.

Mrs. Furman testified that neither her husband nor the other man, whom she later identified as Hamilton, raised their voices.

Both men then returned to their cars. Hamilton and Robinson got out of their car and walked back toward the Furman car. Hamilton was on the driver's side and Robinson on the passenger's side. Mark Furman joined the two and walked to the back of the car with Hamilton, while Robinson stayed towards the middle of the car. After a short conversation, Furman rejoined his wife in the car.

At this point, Hamilton stopped near the driver's side near the door. Mrs. Furman testified that she saw flashes and heard four or five shots from the driver's side. At the same time, she saw flashes from the passenger's side, hearing two or three shots. Robinson testified he was next to the Furman car when he saw flashes and the passenger window break. He pulled his gun and fired two shots into the car. He said he fired towards where the flashes came from.

Robinson testified he hit a woman in the head, trying to push her back so he could get away. Mrs. Furman stated that immediately after the shooting the man on her side of the car, Robinson, grabbed her and said, "You are coming with us." A short conversation followed. She then heard the man say, "I have to take care of this bitch" and she was beaten unconscious with a hard object.

Hamilton and Robinson then fled the scene and drove to the home of Hamilton's wife. From there they proceeded to burn the car they had been driving and which was involved in the accident.

Marcea Holman was a passenger with Hamilton and Robinson at the time of the incident. She testified that she stayed in the car throughout the incident and that as defendants were leaving the car before the shooting she recognized an automatic pistol in Hamilton's hand. She did not see Robinson with a gun at that time, but she identified a gun at trial as being in Robinson's possession.

She testified that upon leaving the car the defendants said to each other, "Are you thinking the same thing as I am?" When she heard gunshots she slumped down in the car seat. After the shooting she heard a woman scream, "You might as well kill me since you killed my husband." She stated Hamilton and Robinson returned to the car and they went to a house.

During cross-examination, she admitted to originally telling the police that she and the defendants had been at the house all day. On redirect examination, she said she had changed her story because she was afraid of being found to be a participant in the shooting. Robinson testified that Marcea Holman was high on drugs and had been nodding off before the accident and during the shooting.

Ballistics evidence indicated that all of the bullets which entered the

victim's body were from the automatic pistol. Testimony from the medical examiner revealed that there were three bullet entrance wounds on the left side of the victim's body and two on the right side. Police investigators found plastic pieces which appeared to come from a pistol grip. A serial number on one of these pieces was identified and matched with the number of a Colt revolver introduced by the State as an exhibit.

The jury found both defendants guilty of murder, attempt murder and attempt aggravated kidnapping. They were found not guilty of attempt armed robbery. After a hearing in aggravation and mitigation, the trial court sentenced both defendants under the law in effect at the time of the offense.

Defendant Hamilton argues that he was denied a trial by a representative and impartial jury because prospective jurors who expressed opposition to the death penalty were excused from duty. He contends that the jury was "death-qualified" and therefore "conviction prone." Hamilton also advanced an equal protection argument in that a legally cognizable group was systematically excluded from jury duty. *Hernandez v. Texas* (1954), 347 U.S. 475, 98 L. Ed. 886, 74 S. Ct. 667.

*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, is cited by Hamilton as authority for his position that the jury was "death-qualified." *Witherspoon* held that a death sentence could not be constitutionally carried out if the jury that imposed it was selected by excluding for cause those prospective jurors who stated general objections to the death penalty or expressed conscientious or religious scruples against its imposition. (391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777.) This holding is limited to those circumstances in which the death penalty is actually imposed by the jury. *Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788.

The *Witherspoon* court, however, carefully defined when a State could properly exclude a juror for cause, stating in footnote 21 of its opinion:

> "We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*. Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction*, as

opposed to the *sentence*, in this or any other case." 391 U.S. 510, 522-23, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.

A reading of the transcript of the voir dire examination shows that all 27 jurors excluded for cause from jury duty were excluded within the guidelines set forth in *Witherspoon*. Any juror expressing scruples against the imposition of the death penalty was questioned extensively by the able trial judge. In each instance the prospective juror was questioned as to the effect his or her feelings would have on their decisions during a trial. Most of the jurors so questioned asserted that their beliefs would inhibit their judgment of guilt or innocence.

■■ As defendant Hamilton points out, nine of the excluded jurors indicated that despite their beliefs on capital punishment they would not be prevented from making an impartial decision as to guilt or innocence. However, as were all other excluded jurors, they were asked, "Would you automatically vote against the death penalty regardless of what facts might reveal?" Each juror responded in the affirmative to this query. We hold that there was no violation of *Witherspoon* and the jurors were properly excused for cause. See *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954; *Spinkellink v. Wainwright* (5th Cir. 1978), 578 F.2d 582, *cert. denied* (1979), 440 U.S. 976, 59 L. Ed. 2d 796, 99 S. Ct. 1548.

Hamilton's claim that the exclusion of these jurors resulted in a jury which was "conviction prone" is without merit. In advancing this argument, Hamilton concedes that this issue was before the Supreme Court in *Witherspoon*. There, as here, data in the form of surveys and tests were presented as evidence that "death-qualified" jurors are partial to the prosecution on the issue of guilt or innocence. The court explicitly declined to adopt this line of thinking, saying (391 U.S. 510, 517-18, 20 L. Ed. 2d 782, 88 S. Ct. 1774-75):

> "The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. [Footnote omitted.] We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. * * *."

Hamilton asserts that considerably more scientific data has become available since *Witherspoon* which will prove his contention.

The obvious implication to be drawn from the type of argument advanced by Hamilton is that a non-death-qualified jury, a jury which includes the excluded jurors in this case, would be impartial with respect

to the question of guilt or innocence. (*Spinkellink v. Wainwright.*) Defendant cites several studies as support for his position: White, *The Constitutional Invalidity of Convictions Imposed by Death-qualified Juries*, 58 Cornell L. Rev. 1176 (1973); Boehm, *Mr. Prejudice, Ms. Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias*, 1968 Wis. L. Rev. 734; Goldberg, *Toward Expansion of* Witherspoon: *Capital Scruples, Jury Bias and the Use of Psychological Data to Raise Legal Presumptions*, 5 Harv. Civil Rights-Civil Liberties L. Rev. 53 (1970); Bronson, *On the Conviction Proneness and Representativeness of the Death-qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U. Colo. L. Rev. 1 (1970); Jurow, *New Data on the Effect of a "Death-qualified" Jury on the Guilt Determination Process*, 84 Harv. L. Rev. 567 (1971).

In *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363, the Illinois Supreme Court was confronted with the same *Witherspoon* problem that is now before us. At that time the court, relying on *Witherspoon*, held there was not yet sufficient factual basis to hold that jurors without scruples concerning capital punishment are biased in favor of the prosecution. (52 Ill. 2d 374, 393.) This position was again reaffirmed without further analysis in *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.

The Bronson, Jurow and Boehm studies were most recently called to the attention of our supreme court in *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233. However, because of the nature of the issues there the court did not pass upon the validity of those studies. See also *People v. Smith* (1980), 91 Ill. App. 3d 438, 414 N.E.2d 1281.

■■ At most, the studies before us show only a pattern of correlation between a juror's attitude toward the death penalty and his attitude toward conviction in a particular trial. (See *United States ex rel. Clark v. Fike* (7th Cir. 1976), 538 F.2d 750, *cert. denied* (1977), 429 U.S. 1064, 50 L. Ed. 2d 781, 97 S. Ct. 791.) These studies have been found to contain insufficient data to dispel the "fragmentary and tentative" nature of the empirical evidence. (*United States ex rel. Townsend v. Twomey* (7th Cir. 1972), 452 F.2d 350; *Craig v. Wyse* (D. Colo. 1974), 373 F. Supp. 1008; *United States ex rel. Clark v. Fike; People v. Murphy* (1972), 8 Cal. 3d 349, 503 P.2d 594, 105 Cal. Rptr. 138.) We, too, cannot say that defendant was denied a fair trial because of the exclusion of jurors who had scruples against capital punishment.

■■ Defendant Hamilton also advances an equal protection argument, stating that the excluded jurors are a legally cognizable group. This contention has primarily been considered where there has been systematic exclusion of a "distinct class" from jury duty based upon race or sex. (See *Hernandez v. Texas* (1954), 347 U.S. 475, 98 L. Ed. 866, 74 S. Ct. 667; *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692.)

The group of excluded jurors presented here cannot be considered a "distinct class" meriting equal protection status under the Fourteenth Amendment. *Cf. Witherspoon*, where it is noted that a jury must "express the conscience of the community on the ultimate question of life or death." 391 U.S. 510, 519, 20 L. Ed. 2d 783, 88 S. Ct. 1775.

Finally, Hamilton asserts that his constitutional right to be tried by a representative cross-section of the community has been violated. The analysis of this argument differs from the equal protection argument discussed above. (*Duren v. Missouri* (1979), 439 U.S. 357, 368, 58 L. Ed. 2d 579, 589 n.26, 99 S. Ct. 664, 670 n.26; *cf.* dissenting opinion of Mr. Justice Rehnquist, 439 U.S. 357, 370, 58 L. Ed. 2d 579, 591, 99 S. Ct. 664, 672.) In order to establish a prima facie violation of the sixth amendment fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process. (*Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668.) However, the "[s]tates remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 42 L. Ed. 2d 690, 702, 95 S. Ct. 692, 701; *Duren v. Missouri* (1979), 439 U.S. 357, 367, 58 L. Ed. 2d 579, 589, 99 S. Ct. 664, 670.

Assuming that the above stated criteria are met, we feel that exclusion of the jurors who would automatically vote against the death penalty regardless of the evidence is proper. The right to a trial by jury means a "fair trial by a panel of impartial, 'indifferent' jurors." (*Irvin v. Dowd* (1961), 366 U.S. 717, 722, 6 L. Ed. 2d 751, 755, 81 S. Ct. 1639, 1642.) Impartiality requires not only freedom from bias against the accused and for the prosecution, but also freedom from bias for the accused and against the prosecution. *Hayes v. Missouri* (1887), 120 U.S. 68, 30 L. Ed. 578, 7 S. Ct. 350; *Spinkellink v. Wainwright*.

The voir dire of the jurors excluded in this case shows that they could not be impartial during the sentencing stage of the trial. It should also be noted that several jurors who expressed an automatic bias against defendant were also excluded for cause. The jurors actually selected, on the other hand, stated they could be impartial at all stages of the trial. Being not opposed to capital punishment is not synonymous with favoring it. *Turberville v. United States* (D. C. Cir.. 1962), 303 F.2d 411, *cert. denied* (1962), 370 U.S. 946, 8 L. Ed. 2d 813, 82 S. Ct. 1607.

■■ The jury so constituted was impartial and did not violate the repre-

sentative cross-section requirement of the sixth and fourteenth amendments.

Hamilton further argues that his convictions for attempt murder and attempt aggravated kidnapping should be reversed because he was not accountable for Robinson's actions. We disagree.

The Criminal Code of 1961 provides:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense \* \* \* he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. \* \* \*." Ill. Rev. Stat. 1979, ch. 38, par. 5—2.

Hamilton maintains that he cannot be held accountable for Robinson's spontaneous and independent actions and that his mere presence and knowledge of those actions is insufficient to prove accountability. He relies on the following cases: *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121; *People v. Bowman* (1971), 132 Ill. App. 2d 744, 270 N.E.2d 285; and *People v. Washington* (1970), 121 Ill. App. 2d 174, 257 N.E.2d 190.

In *Sakalas* two defendants beat up a bus driver. When leaving the scene, one of the assailants took the driver's badge. The court held that the other assailant could not be held accountable on an armed robbery charge where there was no evidence that he was actually present and may have already left. In *Bowman*, the defendant was present while a battery took place. However, the victim could not make a positive identification of the defendant so as to hold him accountable for the crime. Once again, in *Washington* a defendant was present while the victim was raped by a group of boys. The victim could not accurately identify defendant as one of her attackers. Thus, the court held the theory of the defendant's accountability for the group was not supported by the evidence.

More on point are those cases which deal with the common design or common purpose rule. (See *People v. Armstrong* (1968), 41 Ill. 2d 390, 243 N.E.2d 825, *cert. denied* (1969), 394 U.S. 992, 22 L. Ed. 2d 768, 89 S. Ct. 1483; *People v. Rybka* (1959), 16 Ill. 2d 394, 158 N.E.2d 17.) Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes criminally liable for any wrongdoing committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively participate in the overt act itself. *People v. Hughes* (1962), 26 Ill. 2d 114, 185 N.E.2d 834; *People v. Bell* (1981), 96 Ill. App. 3d 857, 421 N.E.2d 1351.

■■ Proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by the group. (*People v. Richardson* (1965), 32 Ill. 2d 472, 207 N.E.2d 478, *cert. denied* (1966), 384 U.S. 1021, 16 L. Ed. 2d 1023, 86 S. Ct. 1935; *People v. Jones* (1973), 11 Ill. App. 3d 450, 297 N.E.2d 178.) Also, it is no defense that the criminal acts were not committed pursuant to a preconceived plan where the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. *People v. Richardson.*

The evidence shows that there was more than mere presence on the part of Hamilton at the scene of the incident. Hamilton was closely associated with Robinson before and after as well as at the time the crimes were committed. Mrs. Furman testified that there were simultaneous gunshots from both sides of the car. Immediately after this occurrence, Robinson reached into the car, grabbed Mrs. Furman and said, "You are coming with us." She also testified that both defendants then had a conversation, after which Robinson proceeded to beat her with a hard object. Testimony of various police officers revealed that plastic pieces of a pistol grip were found in the car.

Marcea Holman, a passenger in defendants' car, testified that when defendants got out of the car Hamilton said to Robinson, "Are you thinking the same thing as I am?" She also stated that she saw a gun in Hamilton's hands.

■■ The evidence in this case is of such a nature that the jury was justified in finding that Hamilton was accountable beyond a reasonable doubt for the attempt murder and attempt aggravated kidnapping of Mrs. Furman. The determination of the jury will not be set aside unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. McClindon* (1973), 54 Ill. 2d 546, 301 N.E.2d 290, *cert. denied* (1974), 415 U.S. 992, 39 L. Ed. 2d 889, 94 S. Ct. 1593, and 416 U.S. 958 (1974), 40 L. Ed. 2d 308, 94 S. Ct. 1973; *People v. Anderson* (1971), 48 Ill. 2d 488, 272 N.E.2d 18.) We find that the evidence was not of that character.

Likewise, defendant Robinson argues he is not guilty of murder beyond a reasonable doubt and cannot be convicted on the theory of accountability. We disagree. Because of the above analysis and further evidence adduced at trial, we believe Robinson's murder conviction was proper.

Robinson's own testimony revealed he fired shots into the Furman car. After that, he proceeded to beat Mrs. Furman with a pistol. He also testified to the joint attempt made with Hamilton to destroy the car they were driving and to fabricate a story for an alibi. The record reflects sufficient evidence for the jury to find that Robinson acted with Hamilton

to further a common purpose, the murder of Mark Furman. The jury's verdict will not be set aside absent such improbability as to raise a reasonable doubt of guilt. (*People v. McClindon*; *People v. Anderson*.) There is no such improbability here.

Robinson contends it was error for the trial court to deny his motion to bar the use of prior drug convictions for impeachment purposes. It is urged that the offenses (Federal drug convictions for unlawful possession of heroin with intent to distribute and conspiracy to distribute heroin) are not indicative of a capacity for veracity. It is also argued that the use of the convictions unfairly prejudiced defendant.

We do not doubt the use of a prior conviction to impeach a witness can have a prejudicial effect on the trier of fact. (See *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) In *Montgomery*, the court adopted a general standard by which the credibility of a witness may be impeached. A prior conviction may be used for impeachment purposes if the crime (1) was punishable by death or imprisonment in excess of one year or (2) involved a dishonest or a false statement regardless of the punishment, unless (3) in either case the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. 47 Ill. 2d 510, 516.

The decision to allow a prior conviction to impeach a witness rests in the sound discretion of the trial court. (*People v. Washington* (1973), 55 Ill. 2d 521, 304 N.E.2d 276.) It has been held that the offense of possession of heroin indicates a disposition to place the advancement of individual self-interest ahead of principle or the interest of society and, as such, would suggest a willingness to do so again on the witness stand. (*People v. Nelson* (1975), 31 Ill. App. 3d 934, 335 N.E.2d 79; *People v. Daily* (1979), 79 Ill. App. 3d 928, 398 N.E.2d 923.) Moreover, the Federal offenses of which defendant was convicted carry sentences of imprisonment for up to 15 years. 21 U.S.C. 841(b)(1) (1976).

■■ In weighing the probative value of receiving the defendant's testimony versus the risk of unfair prejudice, the court must consider the nature of the crime, the nearness or remoteness in time of the conviction to the trial, the subsequent career of defendant and the similarities of the crimes. (*People v. Montgomery*; *People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563.) Considering these factors, it is important to note that Robinson's Federal convictions had taken place only 17 months prior to this incident. He was released on an appeal bond when the incident occurred. Defendant was not unfairly prejudiced by the admission of his prior convictions. The trial judge did not abuse his discretion in this regard.

Defendant Robinson further contends he was unfairly prejudiced by the improper cross-examination and closing arguments of the prosecutor.

Prejudice is claimed in two instances of cross-examination. These occurred when the prosecution questioned defendant about his arrest record and also when defendant was questioned about an alleged gun switch during the shooting incident. We find no prejudicial error in either line of questioning by the State.

On direct examination, defendant testified that he had been convicted of a crime once in his life. During cross-examination, defendant was asked if there had been any other criminal convictions. This line of questioning involved such details as the charge, the date of conviction and the name of the sentencing judge. Defendant denied any other prior convictions. Throughout this particular cross-examination no objection was made.

■■ It is true, as defendant points out, that there can be no more damaging question to a defendant than one which suggests he is a criminal. (See *People v. Flynn* (1956), 8 Ill. 2d 116, 133 N.E.2d 257.) Defendant argues that the questioning about an unlawful use of weapons conviction does not come within the *Montgomery* rule. We note, however, where a defendant makes an affirmative statement as to the completeness of his prior convictions, he may be cross-examined regarding any other convictions regardless of whether they would otherwise have been admissible. *People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382; *People v. Brown* (1978), 61 Ill. App. 3d 180, 377 N.E.2d 1201; *People v. Nastasio* (1963), 30 Ill. 2d 51, 195 N.E.2d 144.

Robinson also argues that the prosecution's questions regarding a possible gun switch during the incident were improper and require reversal. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353.) The record shows that gunshots from the same gun entered the victim's body from both the left and right. There also was testimony by Marcea Holman to the effect that Hamilton had an automatic pistol in his hand before the shooting and that afterwards he had a revolver in his hand. The State argues that the questions were exploratory and were related to matters solely in Robinson's knowledge.

■■ A review of the record reveals that the complained-of cross-examination consisted of only three questions to the defendant. In *People v. Nuccio*, the State's conduct consisted of a pattern of unsupported insinuations as to two defense witnesses, including the defendant. Here, we find that the line of questioning by the State was proper and supported by physical evidence and previous testimony.

Robinson also complains that the prosecution made improper remarks in the closing arguments. These relate, again, to statements concerning the State's theory of a gun switch by the two defendants. He argues there is no evidence to support the State's theory, especially when he denied ever having fired the automatic pistol. Closing argument must

be based on facts in evidence or upon reasonable inferences which can be drawn from these facts. (*People v. Vasquez* (1972), 8 Ill. App.-3d 679, 291 N.E.2d 5; *People v. Watson* (1981), 94 Ill. App. 3d 550, 418 N.E.2d 1015.) We feel that there is evidence to support the State's argument and it was not improper to comment on their theory.

Hamilton also contends it was error to refuse his tendered instruction on voluntary manslaughter. (See *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31; *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.) This claim is made by defendant apparently with the assertion that his actions were solely those of self-defense. The general rule is that if there is evidence in the record which, if believed, would reduce the crime to manslaughter, an instruction defining that crime should be given. (*People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756.) However, it is equally well settled that such an instruction should not be given if the evidence clearly demonstrates that the crime was murder and there is no evidence to support a conviction of manslaughter. *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131, *cert. denied* (1972), 409 U.S. 914, 34 L. Ed. 2d 175, 93 S. Ct. 247; *People v. Latimer* (1966), 35 Ill. 2d 178, 220 N.E.2d 314.

The relevant portion of the voluntary manslaughter statute provides that "[a] person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b).) Voluntary manslaughter therefore is not established where the defenses of article 7, by their own terms, history and purpose, are inapplicable. *People v. Gleckler* (1980), 82 Ill. 2d 145, 411 N.E.2d 849.

The only basis for the instruction requested by defendant would have to be that the victim acted in such a way as to put defendant in such a position that he believed deadly force was necessary to prevent imminent death or great bodily harm to himself. (See Ill. Rev. Stat. 1979, ch. 38, par. 7—1.) We do not view the record in this case as being sufficient to support defendant's argument. It is clear from the testimony of the witnesses that the victim was sitting in his car and was in no way making himself a threat to either defendant. We also note that when the shooting began, Robinson fired his pistol and then pistol-whipped Mrs. Furman after a short conversation with his partner, Hamilton.

■■ The testimony upon which Robinson relies is not, even if believed, evidence from which the jury could find that the lesser-included offense of voluntary manslaughter was committed rather than murder. (*People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89.) We concur with the

trial court's decision refusing to give the tendered manslaughter instructions.

Lastly, both defendants argue that their respective sentences for murder are excessive. Robinson also argues that his sentence for attempt murder is excessive and that the sentences ignore his potential for rehabilitation.

The imposition of a sentence is a matter of judicial discretion and, absent any abuse of that discretion by the trial court, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The sentencing statute for murder permits a more severe minimum sentence upon consideration of the offense and the history and character of the defendant. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) The sentences imposed upon the defendants here are within the limits prescribed by the legislature. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b); see *People v. Soto* (1975), 35 Ill. App. 3d 166, 341 N.E.2d 107 (sentence of 100 to 300 years for murder); *People v. Larsen* (1977), 47 Ill. App. 3d 9, 361 N.E.2d 713 (sentence of 100 to 300 years for murder).

■■ The trial judge held a hearing in aggravation and mitigation. The record reveals that the past record, family situation and personal traits of each defendant were before the trial judge for his consideration. At the time of the incident, defendant Hamilton was on parole. He had been convicted for aggravated battery and attempt murder. Defendant Robinson had been convicted of Federal drug violations at that time. He also had been convicted for an unlawful use of weapons charge in 1976. The trial judge was in the best position to evaluate the likelihood of Robinson's rehabilitation. At the time of the sentencing, the trial judge described the crime as "brutal and senseless." We cannot say, nor have the defendants shown, that the trial court abused its discretion.

■■ Defendant Hamilton also filed a *pro se* brief. In it he raises several issues, one of which was the *Witherspoon* jury issue considered above. Two other issues are addressed in the brief. First, Hamilton contends the trial court erred in not granting his motion to quash the arrest and suppress the evidence found during an illegal search. Defendant's arrest occurred at his wife's house shortly after the incident. State Trooper Underwood, along with Lieutenant Hughes of the Harvey Police Department, were the arresting officers. A review of the record shows that the arresting officers had sufficient information for probable cause to exist. Mrs. Furman had supplied a description of her attackers to investigating officers. She also had written down the license number of the car involved in the accident. This car was found engulfed in flames in Harvey, Illinois, shortly after it was reported to be stolen. An investigation of the license number led the officers to the address where Maria Hamilton resided. She

was the registered owner of the car. Upon arriving at the address, Trooper Underwood found two men, the defendants, who fit the descriptions given by Mrs. Furman. After defendants were taken into custody, a search warrant for the premises was issued based on this information. We find that it, too, was properly issued.

Secondly, defendant Hamilton contends that the trial court abused its discretion in not polling the jury concerning several newspaper and other media accounts of the shooting incident. The record does not contain any of the articles complained of. It appears that nothing was presented to the trial court with the exception of defendant Robinson's motion for a change of trial site. This motion alleged that a fair and impartial jury would be unattainable because of the local publicity of the incident. It was not accompanied with any articles or abstracts of media accounts of the incident.

■■ The question of whether a jury should be interrogated with respect to media publicity surrounding a crime rests in the exercise of the sound discretion of the trial judge. (*People v. Heller* (1971), 131 Ill. App. 2d 799, 267 N.E.2d 685.) The failure of defendant to produce the articles in question effectively precludes this court from determining that the trial judge improperly exercised his discretion. We must assume that the court ruled properly. (*People v. Heller* (1971), 131 Ill. App. 2d 799, 802.) The articles attached to defendant's *pro se* brief appeared after the date of sentencing.

The convictions and sentences are affirmed.

Affirmed.

GOLDBERG and McGLOON, JJ., concur.