THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD WINSTON, Defendant-Appellant.

Second District    No. 80-469

Opinion filed May 18, 1982.

Mary Robinson and David Morris, both of State Appellate Defender's Office, of Elgin, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

After a jury trial, defendant, Donald Winston, was found guilty of the offenses of murder and robbery and was sentenced to concurrent extended terms of imprisonment of 60 and 14 years respectively. Defendant appeals, contending: (1) that the trial court erred in refusing to suppress certain statements allegedly obtained after his requests for counsel were ignored by the police and certain members of the State's Attorney's office; (2) that he was denied his fifth amendment privilege against self-incrimination by the State's improper cross-examination; (3) that the selection of the jury in accordance with *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, resulted in a jury which was conviction-prone and more likely to reject an insanity defense; and (4) that the trial court erroneously concluded that the offense of murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and erred in failing

to state for the record the basis for imposing an extended term for the offense of robbery.

Defendant was charged by information, filed on October 26, 1979, with eight counts of murder and one count of robbery. On November 29, 1979, defendant filed a motion to suppress certain statements alleging, *inter alia*, that they were obtained after his requests for counsel had been ignored. A hearing on defendant's motion was held on December 14, 1979, at which the following evidence was adduced.

The State's first witness at the suppression hearing was Thomas L. Knight of the Du Page County State's Attorney's office. On September 26, 1979, Knight interviewed the defendant at the Elmhurst police station. Also present at that interview was Thomas Callum of the State's Attorney's office. Initially, Knight informed defendant of his *Miranda* rights and defendant acknowledged that he understood. Knight testified as follows concerning his conversation with the defendant:

"I then said, 'Would you like to tell us about the incident involving the death of Martin Danforth?

Q. What if anything did the defendant reply to that?

A. He said 'I'm not sure whether I want to tell you about it. I mean, I want to tell somebody, but if I tell you, you're going to use it against me. And if I tell my own lawyer, he'll use it for me.'

Q. What if anything was your response to that?

A. I said, 'I understand that, and that's certainly your right and we'll adhere to that. Is there anything that you do want to tell us?

Q. And what if anything did the defendant say?

A. He said, 'What do you want to know?'

Q. What if anything was stated next?

A. I said, 'Anything that you want to tell us about the incident.' I said, 'Anything that would help us understand what happened, understand your side of the story.'

Q. Did the defendant ever ask for an attorney?

A. No, he did not.

Q. All right. Did defendant ever refuse to answer any questions during this interview?

A. No, he did not."

Knight further testified that the defendant was at no time during the interview subject to coercion or threats.

Thomas Callum, an assistant State's Attorney who was also present at the interview of the defendant on September 26, 1979, testified that after Thomas Knight advised the defendant of his rights and asked him if he would waive those rights and talk, the defendant stated that "he wasn't sure if he wanted to talk to us; that he wanted to talk to somebody; that if he talked to us that we would use it against him; that if he talked to his own

lawyer, he would use it for him." Knight told defendant that he was correct and that it was his option whether or not to speak. Defendant then responded, "[w]hat do you want to know?" Callum testified that the defendant did not refuse to answer any question and that no form of coercion was used.

James Stamper, a police officer for the city of Elmhurst, also interviewed the defendant on September 26, 1979, at approximately 2 p.m. Detective Anthony Markos was also present at the interview. After entering the interview room, Stamper advised defendant of his rights. Defendant then acknowledged that he understood those rights and stated " 'yes, I would answer questions except that there might be some questions which I don't want to answer.' " During the course of the interview, defendant did not ask to speak to an attorney. Defendant refused to answer two questions concerning his sexual relations with the deceased stating that he did not want to answer until he could see an attorney. Stamper also testified that no form of coercion was used on the defendant.

On cross-examination, Stamper testified that he transported the defendant from a jail in Boston, Massachusetts. During this time, although defendant did not specifically request an attorney, he indicated that "eventually when he got back that he would be requesting an attorney, and he had previously asked as to the procedure for a public defender being appointed." Stamper told the defendant in response to his questions concerning the appointment of a public defender, that a public defender, in all probability, would be appointed at the bond hearing "the following morning." Stamper also told the defendant, however, that if defendant desired an attorney "right now" that he would call the State's Attorney's office to "see what arrangements, if any, could be made in regards to that today."

Anthony Markos, a police officer for the city of Elmhurst, testified that he was also involved in the interview of the defendant on September 26. Markos stated that Officer Stamper advised the defendant of his *Miranda* rights, and the defendant stated that he understood. During the interview defendant did not ask for an attorney but did refuse to answer two questions.

Defendant, Donald Winston, next testified that on September 25, 1979, Officers Stamper and Komerska had a conversation with him in the FBI building in Boston, Massachusetts. The officers informed him that they had a warrant for his arrest and that they were going to extradite him back to Illinois. The officers also asked defendant "if there was anything [he] wanted to tell them about the death of Martin G. Danforth." Defendant responded, "No, there is nothing I want to say to you." When the officers informed the defendant that he would be tried in Illinois for murder, defendant stated, "Well, of course I'm going to need an attorney. And since

I have no money, how am I going to get an attorney?" Defendant then testified that during a car ride to the Boston jail, he stated that he would like to talk to an attorney before he made any more statements. Defendant also testified that he expressed his desire for an attorney to the officers at the Boston airport and also during the airplane trip to Chicago. Defendant testified as follows concerning what transpired upon his arrival at the Elmhurst police station:

> "A. Well, the biggest conversation we had about it was soon after we were in the interview room, soon after Markos and Stamper had started to get me to answer questions. You know, they were giving me my Miranda rights and telling me this and that.
>
> And then I said, 'Well, I don't want to say anything until I talk to an attorney.' I know that. And they said, 'Do you have any money?' and I said 'No.'
>
> They said, 'How do you expect to get an attorney?' And I said, 'Well, there is such a thing as a public defender, isn't there?' They said, 'Yes.'
>
> And I said, 'Well, can I talk to one now?' And they said, 'No. About the soonest you can talk to one is tomorrow after you go to a bond hearing.'
>
> Q. What did they say then, sir—
>
> A. They said—started asking me questions about Martin G. Danforth and his death."

Defendant testified that he repeatedly asked for an attorney while in the interrogation room and that he stated that he did not want to answer questions.

With regard to defendant's conversations with Thomas Knight and Thomas Callum, defendant testified that he was "pretty well broken down" by the time that they arrived. Defendant stated that when they first came in, he asked for an attorney. An attorney was not appointed for the defendant until the morning of September 27, 1979.

The final witness called by the defendant at the hearing was Lyle Rossiter, a qualified forensic psychiatrist. Dr. Rossiter had examined the defendant and diagnosed him as alcoholic and homosexual. Rossiter also described defendant's personality disorder as follows: "Individuals with this type of personality problem typically enter into interpersonal relationships in which they develop a very dependent mode of dealing with another person to such an extent that they will frequently become submissive, extremely compliant and, in some cases, which is true in Mr. Winston's case, virtually surrender their will and freedom of choice to someone else to whom they have become very attached."

In rebuttal, the State recalled Officer Stamper. Stamper denied the

defendant had requested the services of an attorney during his various conversations with the defendant in Boston. Stamper also testified that defendant did not request an attorney on the plane trip from Boston nor the ride to the Elmhurst police station. On cross-examination, Stamper stated that during his conversation with defendant at the Elmhurst police station, defendant merely inquired about the procedure for the appointment of a public defender but did not indicate that he wanted one or that he did not want to answer any further questions.

Terry Komerska, a police officer for the city of Elmhurst, next testified that he accompanied Officer Stamper to Boston in order to extradite the defendant. Komerska stated that Stamper advised the defendant of his rights and that the defendant did not request an attorney. Komerska also testified that defendant did not request an attorney during two separate car rides in the Boston area nor did he request an attorney during the ride to the Boston airport or during the plane ride to Chicago. During the entire time that Komerska was in the presence of the defendant, he never heard the defendant request an attorney.

Finally, the parties entered into a stipulation to the effect that Leonard Weir, a Boston police officer who transported the defendant on several occasions to and from court, if called as a witness, would testify:

"4. That he advised Winston of his rights and explained the Interstate Rendition proceedings to Winston at the United States Marshall's Office, and that he told Winston that Winston was not to discuss the pending Illinois charges with him.

5. That after dismissal of Federal Charges, he again advised Donald Winston of his rights following his being taken into custody by Massachusetts authorities and that he advised Donald Winston that an attorney would be appointed to represent him during the Rendition proceedings pursuant to Massachusett's [*sic*] law.

6. That Donald Winston was advised he had the right to make a telephone call and exercise that right and that he volunteered to Donald Winston that an attorney would undoubtedly be appointed for him when he got back to Illinois.

7. That he advises all persons transported by him not to make any statements concerning their charges until they have talked with an attorney at the ultimate destination.

8. That he does not recall Donald Winston requested an attorney while in his presence."

After the parties had filed briefs in support of and opposition to the motion and after hearing argument, the court denied the motion on January 21, 1980.

From February 25 to March 3, 1980, *voir dire* of prospective jurors was conducted. On request of the State, numerous prospective jurors

were excused for cause after expressing opposition to the death penalty. After a jury had been selected, the case proceeded to trial on March 3, 1980.

Testimony at the trial disclosed the following. Officers James Stamper and James Altman had driven to the decedent's home after receiving a call informing them that the decedent had not been at work for two days. The officers discovered the body of the decedent, Martin Danforth, in bed, lying face down, and naked. An extensive amount of blood was observed on the bed and near the body. A belt had been looped around the victim's neck and pulled tight. In examining the rest of the Danforth house, Stamper observed a small, grey metal bowl, approximately half full of water, located in the middle of the bathtub. Also found in the home was a man's black wallet containing various items of identification of the defendant.

Officer Stamper later testified that after he had been informed that defendant had been apprehended in Boston, he traveled to Boston to bring defendant back to Illinois. After arriving back at the Elmhurst police station, defendant agreed to answer questions after being informed of his rights. Defendant told Stamper that he had met Danforth in a bar, and thereafter, he began to live with Danforth. Defendant stated that Danforth expected him to "perform sexually" for him. On the date of the offense, defendant complied with Danforth's request to place a belt around Danforth's neck and choke him. Defendant then hit the decedent, and the two became "all covered with blood." Defendant then went to the bathroom to wash up and later searched the house and found approximately $2,500 in the decedent's wallet and dressers. Defendant took Danforth's car and drove around all Sunday. Defendant tried to return to Danforth's home to obtain his wallet, but when he noticed a police car in front of the house, he did not go in. He then drove the car to a church where he got on a bus for Boston. In response to Stamper's question inquiring as to the reason for the offense, defendant stated "because of the way Marty treated me. He was, he was drunk all of the time and he acted crazy and he was just crazy * * *."

Thomas Knight of the Du Page County State's Attorney's Office also testified to his conversation with the defendant. Defendant described to Knight the various sexual activities he engaged in with the decedent on the date of the offense. Defendant indicated to Knight that Danforth had a belt around his own neck which Danforth was pulling on. Defendant further stated that Danforth was hurting him so he reached out and grabbed a metal ashtray that was near the bed and began hitting Danforth in the back of the head with it. He continued to strike Danforth until he stopped moving. Defendant then took a shower, searched the house for money, and took Danforth's car to a bar.

Later in the trial, Hans Dolz, a certified pathologist, testified that he had performed an autopsy on the body of Martin Danforth. Dolz observed a band-like depression around the neck of the decedent, lacerations and hematomas around the head and neck area, and "defensive wounds" on the hands. Dolz described defensive wounds on the hands as commonly occurring when a person is assaulted and reaches up with his hands to protect himself. In Dolz' opinion, the death was caused by strangulation.

Peter Makres, who met the defendant on November 19, 1979, in the Du Page County jail, also testified at the trial. Makres had been transported to the Du Page County jail so that he could go to trial on an "outstanding charge." Makres related the content of his conversation with defendant at that time. The witness also stated that defendant gave him several pieces of paper on which defendant had written certain things about which he wanted to talk to his attorney. People's exhibit No. 116, one of defendant's notes, indicated that defendant had had a conversation with "Bill" during which defendant related that he knew of a house that he could easily "rip off and get away with at least a thousand dollars." The note further indicated that during this conversation, defendant stated that the owner of the house "was a drunk and bothered me to the point that I felt like killing him."

Defendant later testified in his own behalf. Direct examination centered largely on defendant's childhood and early family history. On cross-examination the following exchange took place:

"Q. Mr. Winston, I show you what has been marked as People's Exhibit No. 29 for identification—

MR. SIMPSON: Objection.

BY MR. CALLUM:

Q. [continuing]—and ask you to examine that.

THE COURT: The objection is sustained.

BY MR. CALLUM:

Q. Mr. Winston, I show you what has been marked as People's Exhibit No. 116 for identification and ask you to examine that.

MR. SIMPSON: Objection, your Honor.

THE COURT: Yes. The objection is sustained.

BY MR. CALLUM:

Q. Mr. Winston, I ask you to examine what has been marked as People's Exhibit No. 115 for identification.

MR. SIMPSON: Objection, your Honor.

BY MR. CALLUM:

Q. Do you recognize that?

THE COURT: Yes. All of this is beyond the scope of the direct examination.

The objection is sustained.

BY MR. CALLUM:

Q. Mr. Winston, do you know Martin Danforth?

MR. SIMPSON: Objection, your Honor.

THE COURT: The objection is sustained.

BY MR. CALLUM:

Q. Mr. Winston, when did you meet Martin Danforth?

MR. SIMPSON: Objection.

THE COURT: Yes. Let's go back in chambers."

The defense also presented the testimony of two psychiatrists. Dr. Gilbert Ferris had examined the defendant in 1978 and concluded he was suicidal and a latent schizophrenic. Dr. Lyle Rossiter also examined defendant and on the basis of hypothetical question asked him based on the past history of the defendant, Rossiter concluded that defendant would be able to appreciate the criminality of his act but would not be able to conform his conduct to the requirements of the law. In rebuttal, the State called Dr. Jan Fawcett who testified that in her opinion, a person with a history such as defendant's would not lack the capacity to appreciate the wrongfulness of his behavior or to conform such behavior to the requirements of the law.

On March 19, 1980, the jury returned general verdicts of guilt for the offenses of murder and robbery. Thereafter, special death penalty proceedings were held, but the jury failed to find an absence of mitigating factors. After a sentencing hearing, the court sentenced the defendant to extended terms of 60 years' imprisonment for the offense of murder and 14 years' imprisonment for the offense of robbery.

■■■ Defendant first contends that the trial court erred in failing to grant his motion to suppress statements since they were obtained from him after his request for counsel had been ignored by certain police officers and members of the State's Attorney's Office. A statement obtained from a defendant by means of interrogation which continued after the defendant had requested an attorney is a violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. (*People v. Hennenberg* (1973), 55 Ill. 2d 5, 10-11, 302 N.E.2d 27.) A defendant in custody has the right to cut off interrogation by invoking his right to an attorney, and voluntary statements made with a full understanding of *Miranda* rights and pursuant to a valid waiver may be inadmissible if the right to have questioning terminated has not been honored. (*People v. Krueger* (1980), 82 Ill. 2d 305, 310, 412 N.E.2d 537.) If a defendant chooses to speak and does not request a lawyer after being informed of and understanding those rights, the court may properly find that he understood his rights and chose not to exercise them. *People v. White* (1977), 52 Ill. App. 3d 517, 523, 367 N.E.2d 727.

With regard to defendant's testimony at the suppression hearing that he did, in fact, request a lawyer, the trial court stated:

> "The police officer's testimony and your testimony, I have to believe one or the other. If I believe your testimony that you asked for the appointment of the Public Defender, I certainly would grant your motion. I didn't believe your testimony is what it boils down to."

■■ In ruling on a motion to suppress, it is the trial court's province to determine the credibility of witnesses and the weight to be given their testimony, and its findings should not be disturbed unless contrary to the manifest weight of the evidence. (*People v. Householder* (1980), 81 Ill. App. 3d 31, 33, 400 N.E.2d 988; *People v. Myers* (1978), 66 Ill. App. 3d 934, 935, 384 N.E.2d 516.) In light of the substantial testimony that defendant did not specifically request an attorney, we do not find the trial court's finding to be manifestly erroneous.

The next question becomes whether the other statements of the defendant testified to by the State's witnesses can be interpreted as exhibiting his desire for an attorney such that all questioning should have been discontinued at that point. Defendant cites certain language in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and contends that his statements to police and members of the State's Attorney's Office were sufficient expressions of his desire for counsel. In *Miranda*, the Supreme Court stated that if an accused "indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (Emphasis added.) 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.

■■ There was testimony at the suppression hearing that when initially questioned about the death of Martin Danforth, defendant stated, "I'm not sure whether I want to tell you about it. I mean, I want to tell somebody, but if I tell you, you're going to use it against me. And if I tell my own lawyer, he'll use it for me." We do not construe this statement as an affirmative request for counsel. In *People v. Krueger* (1980), 82 Ill. 2d 305, 412 N.E.2d 537, our supreme court held that the defendant's statement "Maybe I ought to have an attorney" did not constitute an invocation of the right to counsel. The court noted that "a more positive indication or manifestation of a desire for an attorney was required than was made here." (82 Ill. 2d 305, 312, 412 N.E.2d 537.) In the present case, defendant's statements were indecisive, ambiguous, and did not indicate a present desire for an attorney. Additionally, it was the testimony of Officers Stamper and Callum that, after this statement by the defendant, Officer Stamper indicated to defendant that his right to an attorney would be "adhered to." Defendant, however, chose to speak, stating,

"what do you want to know?" Under such circumstances, we cannot interpret defendant's statement as an expression of desire for counsel.

■■ Officer Stamper also testified at the suppression hearing that defendant had inquired about "the procedure for a public defender being appointed." In *People v. Rafac* (1977), 51 Ill. App. 3d 1, 364 N.E.2d 991, the court held that when the defendant raised the question as to how he could be represented by counsel, the interviewing officer should have regarded such an expression as a "red light" which compelled a cessation of all further questioning. However, we find the facts of the present case to be distinguishable. After Stamper informed the defendant that a public defender could be appointed at the bond hearing the following morning, he also stated that if defendant desired an attorney "right now," he would call the State's Attorney's office to see what arrangements could be made. Since defendant was offered the assistance of an attorney at that time but failed to take advantage of it and continued to answer questions, such clearly amounts to a waiver. In contrast, when the defendant in *Rafac* inquired about the appointment of an attorney, he was advised that a public defender would be "appointed to represent him when he went to court on the following Monday." (51 Ill. App. 3d 1, 4, 364 N.E.2d 991.) Thereafter, the interviewing officer encouraged the defendant to cooperate to facilitate defendant's chances for probation. No such pressure was brought to bear upon the defendant in the instant case. We find that defendant has waived his right to the cessation of questioning by continuing to answer questions after he had failed to accept the offer of an attorney "right now."

■■ We also do not interpret defendant's statement while in Boston that he would be requesting an attorney "eventually when he got back" to be a present request for counsel, and as we have concluded, the record does not support that defendant made any such a request at a subsequent time. Additionally, defendant's refusal to answer two specific questions concerning his sexual relationship with the decedent after he had previously answered many other questions cannot be construed as an invocation of the right to remain silent or a request for the presence of an attorney. See *People v. White* (1977), 52 Ill. App. 3d 517, 524, 367 N.E.2d 727.

Thus, we conclude that defendant's various vague references to an attorney were not sufficient to have required that questioning be cut off. As our supreme court stated in *People v. Krueger*:

> "*Miranda's* 'in any manner' language directs that an assertion of the right to counsel need not be explicit, unequivocal, or made with unmistakable clarity. We do not believe, however, that the Supreme Court intended by this language that every reference to an attorney, no matter how vague, indecisive or ambiguous, should

constitute an invocation of the right to counsel." 82 Ill. 2d 305, 311, 412 N.E.2d 537.

■■ ■ Defendant also contends that his statements should have been suppressed because they were obtained in violation of his sixth amendment right to counsel. The rights guaranteed by *Miranda* are based exclusively upon the fifth and fourteenth amendment privilege against self-incrimination. (*Kirby v. Illinois* (1972), 406 U.S. 682, 688, 32 L. Ed. 2d 411, 416-17, 92 S. Ct. 1877, 1881.) However, the right to counsel guaranteed by the sixth and fourteenth amendments entitles a defendant to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239.) Defendant contends that his sixth amendment right to counsel had attached prior to the questioning in this case and cites *United States v. Satterfield* (2d Cir. 1976), 558 F.2d 655, for the proposition that the State has a higher burden of showing waiver under the sixth amendment than it does under those rights guaranteed by *Miranda*. However, the standard of waiver which has been consistently applied in this area is whether the State has proved an intentional relinquishment or abandonment of a known right or privilege. (*Brewer v. Williams* (1977), 430 U.S. 387, 404, 51 L. Ed. 2d 424, 439, 97 S. Ct. 1232, 1242; *People v. Aldridge* (1980), 79 Ill. 2d 87, 93, 402 N.E.2d 176; *People v. Cozzi* (1981), 93 Ill. App. 3d 94, 99, 416 N.E.2d 1192.) The testimony at the suppression hearing indicated that defendant was informed of and acknowledged that he understood his right to counsel. Officer Stamper told defendant that if defendant so desired, he would attempt to procure counsel for him immediately. However, defendant chose to answer the questions propounded to him and expressed reluctance only when the questioning concerned his sexual relationship with the decedent. His refusal to respond to questions only in this area indicates that he was fully aware of his right to do so and that he was not laboring under any misapprehension as to his right to counsel or to remain silent. Under these circumstances, the State had clearly shown a waiver.

■■ The defendant's next two contentions on appeal are that he was denied his fifth amendment rights when cross-examined on inculpatory matters beyond the scope of direct examination and that the method of qualifying the jurors pursuant to *Witherspoon v. Illinois* resulted in a jury biased in favor of the prosecution. Neither of these issues were contained in the defendant's written post-trial motion. Although the State has not asserted the waiver argument in its brief, the general rule is applicable that failure by the defendant to raise an issue in the written motion for

new trial constitutes a waiver of that issue. See *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.

■■ ■ In the record provided us we do not find that any objection was made by defendant to the method of selection of the jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. While it is true that the defendant's counsel did interpose objections to the series of questions posed to defendant during cross-examination at trial, it is not sufficient that a party only object at trial to preserve an issue for review, but it is necessary to specifically include that issue in a post-trial motion. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 181, 415 N.E.2d 1027; *People v. Pallardy* (1981), 93 Ill. App. 3d 725, 730, 417 N.E.2d 851.) Specific references in post-trial motions to the reasons why a trial judge's actions on rulings were wrong enables him to reconsider their propriety in a less pressured environment. If an egregious error has actually occurred, the judge can order a new trial, thus avoiding the delay and expense of appellate review. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358-59, 418 N.E.2d 739.) Issues not raised in a post-trial motion are effectively waived for appellate review. (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227.) When a claim of error has not been so preserved, it will only be considered by a reviewing court under the plain error doctrine set forth in Supreme Court Rule 615(a) (73 Ill. 2d R. 615(a)). The doctrine of plain error may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091.

■■ In the instant case, the objections to the series of questions asked defendant on cross-examination were promptly sustained and the questions did not refer to any new matters not already in evidence. The prompt sustaining of the objections and the later general instruction to disregard questions to which objections were sustained cured any possible prejudice to defendant. (*People v. Panczko* (1980), 86 Ill. App. 3d 409, 407 N.E.2d 988; *People v. Callaham* (1978), 60 Ill. App. 3d 1020, 377 N.E.2d 171.) From our close examination of the entire record, we conclude that this error complained of fails to rise to the level of plain error.

■■ ■ We would also observe that a defendant who takes the stand waives the privilege against self-incrimination to the extent necessary for legitimate cross-examination (*People v. Burris* (1971), 49 Ill. 2d 98, 104, 273 N.E.2d 605.) While, as a general rule, cross-examination is limited to the subject matter inquired into on direct examination, it is proper on cross-examination to develop all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony although they may incidentally constitute new matter which aids the

cross-examiner's case. (*People v. Williams* (1977), 66 Ill. 2d 478, 486, 363 N.E.2d 801.) Thus, counsel should be aware of this rule when seeking to limit cross-examination of a defendant when he has chosen to testify and restricted his direct testimony.

■■ We have reviewed also the defendant's contention that the qualification of the prospective jurors pursuant to *Witherspoon v. Illinois* resulted in the selection of a jury that was conviction-prone and one which was more likely to reject an insanity defense to determine if the argument qualifies under the "plain error" exception. It does not. Our supreme court recently held that studies cited to it as supporting the argument that *voir dire* examination of a jury conducted in accordance with *Witherspoon v. Illinois* results in a conviction-prone jury are not persuasive. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) Our supreme court has also rejected defendant's contention raised here that a jury selected pursuant to *Witherspoon v. Illinois* is one which is more likely to reject an insanity defense and find a defendant sane. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) We find nothing in the two studies on this subject cited to us by defendant (Haney, *Juries and the Death Penalty: Readdressing the Witherspoon Question*, 26 Crime & Delinq. 512 (1980), and Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U. Colo. L. Rev. 1 (1970)) which would cause us to depart from those decisions. (See also *People v. Hamilton* (1981), 100 Ill. App. 3d 942, 427 N.E.2d 388; *People v. Smith* (1980), 91 Ill. App. 3d 438, 414 N.E.2d 1281; *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 387 N.E.2d 1284.) Accordingly, from a review of the record we find no error in this regard and have no reason to invoke the "plain error" rule.

Finally, defendant contends that the trial court erroneously concluded that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and that it failed to make a finding indicating its basis for imposing an extended term for the robbery. Section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)) provides that an extended sentence may be imposed "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Recently, our supreme court in *People v. LaPointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, held that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty"contained in section 5—8—1(a)(1) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) authorizing natural life imprisonment did not require "torture or unnecessary pain upon his victim" in order to find "brutal" or "heinous" behavior. (88 Ill. 2d 482, 501, 431 N.E.2d 344.) The court stated:

" 'Heinous' is defined by Webster's Third New International

Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' Clearly, in our opinion, the statute does not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain." (88 Ill. 2d 482, 501, 431 N.E.2d 344.)

The court further concluded from the record in that case that the trial court did not abuse its discretion in sentencing the defendant to natural life imprisonment without parole where the defendant "acted with premeditated, cold-blooded deliberation." 88 Ill. 2d 482, 501, 431 N.E.2d 344.

■■ In the case at bar, the record supports the trial court's conclusion that the killing was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The evidence indicates that the defendant acted with premeditation to rob and kill the deceased, that the defendant beat the victim repeatedly in the face and head with an ashtray until he was rendered unconscious, that the defendant wrapped a belt so tightly around the victim's neck that it caused the neck to be severely compressed, and that the defendant showed little concern for the gravity of his actions by his subsequent conduct. We believe this evidence indicates a brutal, merciless, and premeditated killing which comes within the meaning of section 5—5—3.2(b)(2).

While defendant has argued that the extended term of imprisonment for the robbery should be vacated for the trial court's failure to specify the basis for imposing an extended term for that offense, we must reduce that extended sentence on another basis not argued but pertinent to the legality of the sentence. Although the defendant's failure to specifically raise a contention normally constitutes a waiver (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227), the waiver rule is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver in the interest of substantial justice. *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 1149, 428 N.E.2d 937.

We observe that the defendant was sentenced to extended terms for both murder and robbery, the former being a separate and higher classification of offense from robbery which is a Class 2 felony. (See Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—1.) Section 5—8—2(a) provides:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 *for the class of the most serious offense of which the offender was convicted* unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a).)

In *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, the supreme court held that the plain language of this statute required that the most serious offense of which the offender was convicted must be accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The court recognized that this could lead to the anomalous result of insulating a defendant from receiving an extended sentence for an offense accompanied by wanton cruelty by virtue of his conviction of a more serious offense. Subsequently, in *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 1449-50, 428 N.E.2d 937, the appellate court, relying on *Evans*, vacated an extended sentence because it did not belong to the class of most serious offense of which the offender was convicted. We are bound by this statute and those decisions and, accordingly, vacate the extended term of 14 years for the offense of robbery and reduce the defendant's sentence on that conviction to 7 years which is the maximum for a Class 2 felony. See *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 1150, 428 N.E.2d 937.

For the foregoing reasons, the conviction and sentence for murder is affirmed, the conviction for robbery is affirmed, and the sentence for robbery modified to a 7-year concurrent term.

Affirmed as modified.

SEIDENFELD, P. J., and NASH, J., concur.